UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | |
| PROVERIS SCIENTIFIC CORPORATION ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-12424-WGY |
| v. ) | |
| ) | |
| INNOVASYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF PROVERIS SCIENTIFIC
CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF
CONTEMPT AGAINST INNOVASYSTEMS, INC.**

**INTRODUCTION**

InnovaSystems, Inc. ("Innova") is in contempt of the permanent injunction this Court

entered to prohibit Innova from making, using, offering for sale, selling, importing into and

exporting out of the United States its Optical Spray Analyzer device ("OSA").  After finding

Innova's OSA to infringe claims 3 through 10 and 13 of Proveris Scientific Corporation's

("Proveris") U.S. Patent No. 6,785,400 (the "400 patent") and to prevent the irreparable harm

Proveris would suffer if Innova's infringement were allowed to continue, the Court entered a

permanent injunction narrowly tailored to the OSA.  The undisputed facts demonstrate that none

of the changes Innova claims it made are material to any limitation in the '400 patent and that

Innova's "work-around" was limited to insignificant changes in the hardware, tweaking the

OSA's operating software, and changing the name of the device.  Having made essentially

cosmetic changes in the product, Innova continued to sell it in direct contravention of the Court's

order.

As is demonstrated by Innova documents and the testimony of its president, John Waters, Innova's "re-engineered" Aerosol Spray Drug Analyzer device ("ADSA") is the same device as the enjoined OSA in all material respects. The minor differences between the enjoined OSA and the ADSA are entirely irrelevant because they have no affect whatsoever on any element of claim 3 – the only independent claim at issue. Consequently, because nothing more than merely colorable differences exist between the OSA and the ADSA, and because those differences do not affect any element of claim 3, Innova's making, using, offering for sale, numerous sales, and exporting of the ADSA amount to contempt for which a significant sanction is warranted.[1]

## ARGUMENT

### I.   STANDARDS.

In patent litigation, infringement may be determined as a matter of law by a summary judgment. See Athletic Alternatives, Inc. v. Prince Mfg. Co., 73 F.3d 1573, 1578 (Fed. Cir. 1996). Summary judgment is appropriate here if, after reviewing the facts in the light most favorable to Innova, the non-moving party, no genuine issues of material fact exist regarding Innova's contempt and Proveris is entitled to judgment as a matter of law.[2] See FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Failure to comply with injunctions entered to "prevent the violation of any right secured by patent" may be addressed through contempt proceedings. 35 U.S.C. § 283; see also KSM Fastening Sys., Inc. v. Jones Co.,

---

[1] At the Court's direction, Proveris has limited its motion for summary judgment against Innova, as well as the accompanying statement of undisputed facts and this memorandum, to the narrow issue of whether Innova's ADSA is materially different from the enjoined OSA. Proveris respectfully reserves the right to submit arguments related to remedies if and when the Court deems it appropriate.

[2] A fact is "material" only if it may affect the outcome of the case under the applicable law. See Rathburn v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004). An issue is "genuine" only if it is supported by evidence such that a reasonable jury could resolve the issue in favor of the non-moving party. Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2, (1st Cir. 1998). Conclusory allegations, improbable inferences, and "rank speculation," however, are insufficient to establish a genuine issue of fact. Rathburn, 361 F.3d at 66.

Inc., 776 F.2d 1522, 1525 (Fed. Cir. 1985); Brine, Inc. v. STX, L.L.C., 367 F. Supp. 2d 61, 66 (D. Mass. 2005).

Before finding a party in contempt of an injunction entered in an infringement action, the Court must address two questions. See Additive Controls & Meas. Sys., Inc. v. Flowdata, Inc. ("AdCon"), 154 F.3d 1345, 1349 (Fed. Cir. 1998). The first question is whether a contempt proceeding is appropriate to determine whether a re-engineered device infringes or whether a new infringement action is necessary. AdCon, 154 F.3d at 1349; see also Brine, 367 F. Supp. 2d at 67. That determination is made by comparing the original infringing device with the re-engineered device. AdCon, 154 F.3d at 1349. Unless the new device is more than "colorably different" requiring substantial issues to be litigated to determine infringement, a contempt proceeding is appropriate. Brine, 367 F. Supp. 2d at 67; see also AdCon, 154 F.3d at 1349 (even a new issue does not necessarily require a new infringement action).

If a contempt proceeding is appropriate, the second question is "whether the new accused device infringes the claims of the patent." AdCon, 154 F.3d at 1349. For this determination, the patent holder must prove by clear and convincing evidence that the new accused device falls within the scope of the claims admitted or adjudicated and, thus, infringes the patent. Brine, 367 F. Supp. 2d at 67. Significant for present purposes, if the new device "has not been changed from the adjudged device in a way which affects an element of a claim," then the new device "may be treated the same as the device which was admitted or adjudged to infringe." KSM, 776 F.2d at 1529.

## II. DETERMINING INNOVA'S INFRINGEMENT IN THIS CONTEMPT PROCEEDING IS APPROPRIATE BECAUSE THE DIFFERENCES BETWEEN THE OSA AND THE ADSA ARE MERELY COLORABLE.

It is undisputed that the differences between the OSA and ADSA are practically non-existent. The few differences that do exist are merely colorable and, for purposes of infringement, irrelevant. The OSA Documents, on which the Court defined the scope of the injunction, the ADSA User's Guide, and additional documents describing the ADSA demonstrate that the two devices perform the same function with the same key components. (See ADSA Brief User Guide, ADSA Quote, and ADSA Brochure, a true copy of each documents is attached to the Farina Aff. as Exhibit Q, R, and S, respectively. See also OSA User's Guide, OSA 2005 Price List, ADSA User's Guide.) As shown in the following chart ("Comparison Chart II"), the two devices are virtually identical.

| OSA | ADSA |
|---|---|
| High-Speed Digital Camera – "The video camera can record 640 by 480 pixel images at a maximum speed of 250 fps. When the frame size is reduced to a smaller window, rates up to 2000 fps can be achieved."<br><br>OSA User's Guide at 5. | High-Speed Digital Camera – "The video camera can record 640 by 480 pixel images at a maximum speed of 250 fps. When the frame size is reduced to a smaller window, rates up to 2000 fps can be achieved."<br><br>ADSA User's Guide at 6; see also ADSA Brief User Guide at 1; ADSA Quote at 1; ADSA Brochure. |
| Laser, Low Power – "The laser supplied with the OSA emits a continuous beam of light at a nominal wavelength of 660nm (red). The power rating of the laser diode is 50 milliwatts. The laser light passes through an optical assembly that disperses the light in a 30 degree fan pattern."<br><br>OSA User's Guide at 5. | Laser, Low Power – "The laser supplied with the ADSA emits a continuous beam of light at a nominal wavelength of 660nm (red). The power rating of the laser diode is 50 milliwatts. The laser light passes through an optical assembly that disperses the light in a 30 degree fan pattern."<br><br>ADSA User's Guide at 6; ADSA Brief User Guide at 1 |

| OSA | ADSA |
|---|---|
| Rotary Frame Support – "[S]upports the Laser frame in one of two positions.  The frame may be rotated to the Spray Pattern or Plume Geometry test."<br><br>OSA 2005 Price List. | Rotary Frame Support – The laser mount allows "the operator to select the 0 and 90 degree positions in a repeatable manner."<br><br>ADSA User's Guide at 6; ADSA Brief User Guide at 1; see also ADSA Brief User Guide at 2 (spray pattern is set at 0 degrees; plume geometry is set at 90 degrees); ADSA Quote at 1; ADSA Brochure. |
| Calibration Fixtures<br><br>OSA 2005 Price List. | Calibration Fixtures<br><br>ADSA Quote at 1; ADSA Brochure. |
| Data Acquisition Board<br><br>OSA 2005 Price List. | Data Acquisition Board<br><br>ADSA Quote. |
| Actuator Mount – 3 axis mount<br><br>OSA 2005 Price List. | Actuator Mount – 3 axis mount<br><br>ADSA Brief User Guide at 1; see also ADSA Quote at 1. |
| Performs spray pattern and plume geometry tests<br><br>See OSA 2005 Price List (OSA "performs Spray Pattern and Plume Geometry Analysis on Metered Dose Inhaler and Nasal Spray Products"); OSA User's Guide at 1 ("[i]t is designed to . . . record either a plume geometry or spray pattern view of a spray"), 8-9, 26-38. | Performs spray pattern and plume geometry tests<br><br>See ADSA User's Guide at 41-45, 55-61; ADSA Brief User Guide at 1 (the ADSA is used "for the analysis of spray pattern and plume geometry on Inhalation and Nasal products), 2-3; see also ADSA Brochure. |
| Validation Protocols, IQ/OQ<br><br>OSA 2005 Price List. | Validation Protocols, IQ/OQ<br><br>ADSA Quote at 1; ADSA Brochure. |
| Application and Analysis Software – "Image analysis software that outputs FDA-recommended analysis results in Excel spreadsheets."<br><br>OSA 2005 Price List. | Application and Analysis Software – "[t]he analysis software computes the [FDA recommended] spray measurements and exports the results to Excel."<br><br>ADSA Brochure at 2; see also ADSA Quote at 1. |
| Computer<br><br>OSA 2005 Price List. | Computer<br><br>ADSA Quote at 1. |

| OSA | ADSA |
|---|---|
| Actuator – MightRunt Actuator for nasal products<br><br>OSA 2005 Price List. | Actuator – "The ADSA is a bench top station consisting of a desktop computer and a platform on which an actuator, a high-speed camera, and a laser are mounted." Three actuator types are available.<br><br>ADSA User's Guide at 4; see also ADSA Quote at 1; ADSA Brief User Guide at 1 (MightyRunt Actuator may be used); ADSA Brochure (same). |

(See also Proveris Scientific Corporation's Statement of Undisputed Facts in Support of its

Motion for Summary Judgment of Contempt Against InnovaSystems, Inc. ("Facts") ¶¶ 4, 6-8,

10-12.[3])

During his deposition, Waters pointed to some very insignificant differences between the

OSA and ADSA, such as two possible component changes and a mounting bracket change.

Waters also mentioned that the software included some minor bug fixes and provided "prettier"

reports.  Significantly, Waters conceded that Innova is not relying on any of these differences to

effect a work around of the '400 patent, that none of these changes have anything to do with the

'400 patent, and that an OSA could be converted to an ADSA simply with the software

modification to the cropping feature.  (Waters. Tr. at 64-69, 71-74, 78-81.)

Documents produced by Innova and an Innova customer further show the insignificance

of these differences in the products.  After the Court entered the Injunction, Innova purported to

convert the three OSAs it reported it sold (and is enjoined from servicing) into ADSA devices.

(Waters Tr. at 74-75, 172-175.)  In completing the conversion for one of these companies,

Waters wrote to the customer to explain that the OSA had been converted to an ADSA simply

---

[3] Defined terms used herein shall have the meaning provided in Proveris's Facts.

"by replacing the OSA 1.1.2 software with ADSA version 1.0.2" software. (Farina Aff. Ex. O (the "Xemplar Letter").) Waters continued by explaining that key changes between the ADSA software and the OSA software are nothing more than that the ADSA software:

- Fixes spurious frame rate setting bug in camera setup.
- In the Spray Pattern Analysis form, the operator must wait for the raw video to be captured before selecting a subset of the frames for analysis. Selection buttons are identified as 'Crop Start Frame' and 'Crop End Frame'.
- Logic to prevent redundant analysis output saves.
- Replaces all reference [sic] to 'OSA' with 'ADSA'.

(Id.) The document includes no other information regarding any differences between the OSA and the ADSA. Waters testified that aside from the cropping feature, the other software changes were insignificant to the '400 patent. (Waters Tr. at 65-67, 76-81.)

Moreover, the only document Innova produced to which Waters pointed as the document that answers Proveris's interrogatory regarding what exactly the work around is, aside from the Opinion Letter, is a document Innova drafted in December 2007, which provides as follows:

In 2007, InnovaSystems, Inc. introduced a new product, the ISI-5000 Aerosol Drug Spray Analyzer, to replace InnovaSystems OSA Optical Spray Analyzer in support of the Nasal and Pulmonary products market need for the determination of Spray Pattern and Plume Geometry per the FDA Guidances.

The ISI-5000 Aerosol Drug Spray Analyzer includes the following software changes:
- Frame selection controls are available after the video is captured. The control names are now "Crop Start Frame" and "Crop End Frame".
- Moves the raw video file from the temp folder to the report folder when the User elects to save the results of an analysis.

(Farina Aff. Ex. N (the Innova Document"); see also Farina Aff. Exs. K, L, & M; Waters Tr. at 45-49, 54.) The document includes no other information regarding any differences between the OSA and the ADSA.

It is clear then from Innova's documents and Waters' testimony that the only difference between the two devices upon which Innova relies in defense of contempt is its contention that the cropping feature in the ADSA software does not allow the user to establish a "predetermined time" for the cropping to occur as the OSA software supposedly allows. (See Facts ¶¶ 4, 6-8, 10-12.)  This minor software change is the only difference Innova has raised as a work around to distinguish the ADSA from the OSA.  (Waters Tr. at 56.)

This claimed change from the OSA to the ADSA does not create more than a colorable difference in the products for two reasons.  First, the change is only relevant to Innova's rejected claim construction argument and, therefore, is not material.  As Innova previously argued, this one software difference only relates to its new claim construction argument regarding the preamble language in claim 3 concerning "at a predetermined instant in time."  Innova argued that the preamble language amounted to a claim limitation the ADSA does not meet because the ADSA's cropping feature may be used only after image data is produced, not before image data is produced as Innova contends the feature functions in the OSA.  (See Opinion Letter at 17-21; Waters Aff. II ¶¶ 4, 6-7.)  With the Court's rejection of Innova's attempt to have the Court go back and now construe the patent to include the preamble language as a claim limitation, this supposed change in the software is irrelevant and immaterial to the analysis.

Second, the supposed change is of an asserted characteristic of the OSA not reflected in the documents used by the Court to define the scope of its injunction.  The Court enjoined Innova from selling the OSA as depicted in, among other documents, the OSA User's Guide.  (Perm. Inj. ¶ 2.)  Waters admitted, however, that the OSA User's Guide does not include any reference to the supposed ability of the cropping feature to be used during setup for a spray pattern test.  (Waters Tr. at 128, 145.)  Indeed, the OSA User's Guide reflects that the cropping

8

feature is used only <u>after</u> image data is produced – exactly how the feature is used in the ADSA. (<u>Compare</u> OSA User's Guide at 12-13, 33, 35 <u>with</u> ADSA User's Guide at 13-14, 56, 58; <u>see also</u> Waters Tr. at 131-133, 135-137.)  Thus, because Innova is enjoined from selling the OSA as depicted in the OSA User's Guide, since the cropping feature supposedly changed is not included anywhere in the OSA User's Guide, it cannot be used as a parameter against which a difference may be based.  Therefore, the change is irrelevant.

The lack of any relevant difference between the two devices is also shown in a comparison of the user guides.  A comparison of the user guide for the OSA, which the Court used to define the scope of its injunction, with the user guide for the ADSA shows no actual difference in the operation of the cropping feature.  The OSA User's Guide shows the cropping feature in the OSA software (Start Frames and End Frames) to perform in the same way as the cropping feature performs in the ADSA software (Crop Start Frames and Crop End Frames) regardless of when the cropping features are used.  Thus, any supposed difference between the cropping feature in the OSA and the cropping feature in the ADSA is, at most, only colorable as the following chart firmly establishes:

| OSA | ADSA |
|---|---|
| After the "spray event" has been captured by the device, a user "may use the Start Frame and End Frame inputs to chose different start and stop points" before performing the spray pattern analysis.<br><br>OSA User's Guide at 12-13. | "Once the spray has been captured, the Crop Start Frames and the End Crop Frames buttons . . . will appear. . . .  You may use the Crop Start Frames and Crop End Frames controls to remove the extraneous frames before and after the actual spray event."<br><br>ADSA User's Guide at 13-14. |

| OSA | ADSA |
|---|---|
| "The Start Frame button updates the numeric input cell with frame number of the currently displayed frame. The frame of interest should display the start of the actuation, or earlier. Once the approximate frame number is selected, the sequence can be examined one frame at a time by using the mouse scroll wheel or clicking on the up-down control to the right of the input cell."<br><br>"The End Frame button updates the numeric input cell with [sic] frame number of the currently displayed frame. The frame of interest should be at the end of the actuation, or later. Once the approximate frame number is selected, the sequence can be examined one frame at a time by using the mouse scroll wheel or clicking the up-down control to the right of the input cell. | "Crop Start Frames button – Any frames preceding the indicated frame are excluded from analysis. The numeric input cell is updated with the frame number of the currently displayed frame. The frame of interest should display the start of the actuation, or earlier. Once the approximate frame number is selected, the sequence can be examined one frame at a time by using the mouse scroll wheel or clicking on the up-down control to the right of the input cell."<br><br>"Crop End Frames button – Any frames following the indicated frame are excluded from analysis. The numeric input cell is updated with frame number of the currently displayed frame. The frame of interest should be at the end of the actuation, or later. Once the approximate frame number is selected, the sequence can be examined one frame at a time by using the mouse scroll wheel or clicking the up-down control to the right of the input cell. |
| OSA User's Guide at 33. | ADSA User's Guide at 56. |
| After capturing the spray event, "[r]eview recorded sequence with playback controls. Select Start and End frames." Perform the spray pattern analysis.<br><br>OSA User's Guide at 35. | After capturing the spray event, the frames included for analysis "can be changed by updating the Crop Start Frame and Crop End Frame."<br><br>ADSA User's Guide at 58. |

As demonstrated by the user guides, regardless of what the software feature is called – Start Frame and End Frame or Crop Start Frame and Crop End Frame – or when it is used, it provides the same frame cropping option for analysis of image data to both an OSA user and an ADSA user. No difference exists between how the software feature functions in the ADSA and the OSA as defined by the documents specified in the injunction.

Thus, for purposes of infringement and a contempt analysis, the OSA and the ADSA are the same. For this simple, logical reason, the Court should find Innova in contempt and enter judgment as a matter of law in Proveris's favor. With no colorable differences between the two devices, the Court may properly determine whether the ADSA infringes claim 3 in this contempt proceeding.

### III.   THE ADSA FALLS WITHIN THE SCOPE OF CLAIM 3 AND DEPENDENT CLAIMS 4 THROUGH 10 AND 13; THUS, THE ADSA INFRINGES THE '400 PATENT AND INNOVA IS IN CONTEMPT.

Because this contempt proceeding is appropriate, the second question the Court must answer is whether the ADSA falls within the scope of independent claim 3 and, if so, the scope of dependent claims 4 through 10 and 13. See AdCon, 154 F.3d at 1349; Brine, 367 F. Supp. 2d at 67. This step may be streamlined. If the ADSA has not been changed from the OSA in a way that affects an element of claim 3, or any of the dependent claims, then the ADSA may be treated the same as the OSA – as an infringing device. See KSM, 776 F.2d at 1529. Given the inescapable conclusion of infringement, Innova's contempt is unquestionable since Waters admitted that Innova has offered for sale, serviced, and sold ADSA devices from its facility in New Jersey. (Waters Tr. at 145-148, 156-157, 172-175.)

### A.   Innova's Changes Do Not Affect An Element Of Claim 3; Therefore, The ADSA May Be Treated The Same As The OSA – As A Device That Infringes Claim 3.

To the extent Innova made any changes at all to the OSA, none of those changes affect an element of claim 3. The cropping feature Innova asserts as its work around of claim 3 relates to analysis of spray image data, not producing the image data. (Waters Aff. II ¶ 7 ("[o]nly after the spray image is captured can the user enter the Crop Start Frame and End Crop Frame [to] eliminate any frames from any analyzes [sic] the user may elect to perform on the spray image");

Waters Tr. at 131-133; 135-136; ADSA User's Guide at 13-14, 56, 58.)  Claim 3 is an apparatus claim.  It does not describe analysis of image data – only production of image data.  See generally '400 patent, col. 7, ll. 22-45, col. 8, ll. 1-43.  Consequently, the modification Innova supposedly made to the cropping feature is irrelevant to claim 3 or any of the claims dependent on claim 3.  With absolutely no changes that affect an element of claim 3, the Court should treat the ADSA the same as the OSA – as a device that infringes the '400 patent.  See KSM, 776 F.2d at 1526 (contempt may be found on the basis of a modified device).

**B. The ADSA Infringes Claims 3 Through 10 And 13 Of The '400 Patent.**

Even if the Court ignores the supposed modification and compares the ADSA with claims 3 through 10 and 13 of the '400 patent, it will reach the inescapable conclusion that the ADSA infringes these claims.  The apparatus described in independent claim 3 comprises:

> an illuminator for providing an illumination of the spray plume along at
> least one geometric plane that intersects the spray plume; and,
> an imaging device for generating the image data representative of an
> interaction between the illumination and the spray plume along the at
> least one geometric plane.

'400 patent, col. 8, ll. 3-8.  The ADSA has an illuminator (laser) that provides an illumination of a spray plume along at least one geometric plane (laser light sheet) that intersects the spray plume.  (ADSA User's Guide at 2-3.)  The ADSA also has an imaging device (video camera) that generates image data representative of the interaction between the illumination (laser light sheet) and the spray plume along the at least one geometric plane (spray pattern or plume geometry test).  (ADSA User's Guide at 2-3, 5-6, 13-14 (sample acquire sequence for spray pattern), 43-44 (instructions for plume geometry procedure), 57-58 (instructions for spray pattern procedure); ADSA Quote at 1; ADSA Brochure; ADSA Brief User Guide at 2 (for spray pattern "[l]aser/camera orientation:  [l]lightsheet is oriented parallel to table (0 degrees)" and for plume

geometry "[l]aser/camera orientation:  [l]aser lightsheet is oriented perpendicular to table (90 degrees)"), 3 (typical spray pattern and plume procedures).)  There simply is no question that the ADSA infringes claim 3.

The ADSA also infringes dependent claims 4 through 10 and 13 of the '400 patent.  As shown in the relevant portions of Comparison Chart III, below, the ADSA as depicted in the ADSA User's Guide and other documents produced by Innova includes each of the elements contained in these dependent claims.[4]

| '400 Patent Claim | ADSA |
| --- | --- |
| **Claim 4:**  An apparatus according to claim 3, wherein the sequential set of images is representative of a progression in time. | High-Speed Digital Camera – video camera captures from 250 to 2,000 frames per second<br><br>See, e.g., ADSA 2010 Quote at 1; ADSA Brochure; ADSA Brief User Guide at 3 ("[p]ress Acquire and Analyze Sequence button to start recording images"); ADSA User's Guide at 6, 13. |
| **Claim 5:**  An apparatus according to claim 3, wherein a first time-sequential set of images corresponds to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline, and a second time-sequential set of images corresponds to a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline. | Spray Plume Geometry test (along a first geometric plane substantially normal to a flow direction centerline (vertical)); and Spray Pattern test (along a second geometric plane substantially parallel to and intersecting the flow direction centerline (horizontal))<br><br>See generally ADSA Brochure; ADSA Brief User Guide at 2 (for spray pattern "[l]aser/camera orientation:  [l]ightsheet is oriented parallel to table (0 degrees)" and for plume geometry "[l]aser/camera orientation:  [l]aser lightsheet is oriented perpendicular to table (90 degrees)"); ADSA User's Guide at 2-3, 41-44, 55-58. |
| **Claim 6:**  An apparatus according to claim 3, wherein the interaction between the illumination and the spray plume includes optical scattering. | Inherent in use of laser.<br><br>See ADSA Brochure at 2 ("[l]ight scattered from illuminated droplets..."). |

---

[4]  The Court should keep in mind that with the same functionality, Innova admitted that its prior spray pattern and plume geometry test device infringed claims 3 through 10 and 13 of the '400 patent.

| '400 Patent Claim | ADSA |
|---|---|
| **Claim 7:** An apparatus according to claims 3, wherein the interaction between the illumination and the spray plume includes optical absorption. | Inherent in use of laser and a laser's interaction with anything. |
| **Claim 8:** An apparatus according to claim 3, wherein the imaging device includes a digital imaging system for generating and recording the image data. | High-Speed Digital Camera – video camera captures from 250 to 2,000 frames per second<br><br>See ADSA 2010 Quote at 1; ADSA Brochure; ADSA Brief User Guide; ADSA User's Guide at 6. |
| **Claim 9:** An apparatus according to claim 8, wherein the digital imaging system includes an image sampling rate of approximately 500 images per second. | High-Speed Digital Camera – video camera captures from 250 to 2,000 frames per second<br><br>See ADSA 2010 Quote at 1; ADSA Brochure; ADSA Brief User Guide at 3 ("[p]ress Acquire and Analyze Sequence button to start recording images"); ADSA User's Guide at 6. |
| **Claim 10:** An apparatus according to claim 3, wherein the illuminator includes a laser system having a fan-shaped output pattern. | "The laser light passes through an optical assembly that disperses the light in a 30 degree fan pattern."<br><br>ADSA Brief User Guide at 1; ADSA User's Guide at 2, 6. |
| **Claim 13:** A spray data acquisition system according to claim 3, wherein the first and the second geometric planes are substantially orthogonal. | Spray Pattern Setup:  "Laser lightsheet is oriented parallel to table (0 degrees)"<br><br>Plume Geometry Setup:  "Laser lightsheet is oriented perpendicular to table (90 degrees)"<br><br>ADSA Brief User Guide at 2; ADSA User's Guide at 3, 9-10. |

(See also Waters Tr. at 101-102 (Waters cannot identify any difference between the OSA and the ADSA regarding claims 4 through 10 and 13).)

Without question, the ADSA infringes claims 3 through 10 and 13 of the '400 patent. Waters all but admits this fact by claiming only that the cropping feature for image data analysis

is the work around on which Innova hopes to avoid infringement.  That feature, however, is irrelevant to claim 3.  With nothing remaining to prop up Innova's infringing activities and sales, Innova's contempt is obvious.

### C.  Waters Admitted That Innova Has Offered For Sale, Serviced, And Sold More Than $1,000,000 In ADSA Devices And Services.

In his deposition, Waters admitted that Innova serviced all three of the OSA devices it reported to have sold by converting them into ADSA devices.  (Waters Tr. at 172-175.)  Waters admitted that Innova provides customer support and has offered for sale and sold ADSA devices from its facility in New Jersey.  (Id. at 145-148, 156-157.)  By Waters' estimate, Innova has sold seven or eight ADSA devices for a price of approximately $125,000 each.  (Id. at 170.)  Therefore, not even including what Innova charged the former OSA customers to convert their devices to an ADSA, Waters admits that Innova has gained revenues of approximately $1,000,000 from its ADSA activities.  (Id. 145-148, 156-157, 170, 172-175.)  Plainly, given Innova's continued infringement of the '400 patent, Innova is in contempt of this Court's injunction.

## CONCLUSION

No colorable differences exist between the OSA and the ADSA; in fact, the two devices are essentially the same.  Therefore, this contempt proceeding is appropriate.  Moreover, the ADSA clearly and convincingly falls squarely within the scope of admitted claims 3 – 10 and 13

of the '400 patent.  Consequently, the ADSA infringes these claims and Innova is in contempt of the injunction.

<div style="margin-left:40%">

**Respectfully submitted,**
PROVERIS SCIENTIFIC CORPORATION
Plaintiff
By its attorneys,


/s/Victor H. Polk, Jr.
Victor Polk, BBO #546099
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA  02110
(617) 310-6000
(617) 310-6001 Fax

Susan H. Farina, BBO #568068
PROVERIS SCIENTIFIC CORPORATION
290 Donald Lynch Boulevard, Suite 100
Marlborough, MA  01752
(508) 460-8822
(508) 460-8942 Fax

</div>

Dated:  June 2, 2010