UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____     )
                                        )
PROVERIS SCIENTIFIC CORPORATION )
                                        )
                  Plaintiff,            )
                                        )        Civil Action No. 05-12424-WGY
         v.                             )
                                        )
INNOVASYSTEMS, INC.,                    )
                                        )
                  Defendant.            )
_____)
```

## JOINT PRETRIAL MEMORANDUM

In compliance with the Procedural Order issued by this Court on June 27, 2012, plaintiff

Proveris Scientific Corporation ("Proveris") and defendant InnovaSystems, Inc. ("Innova")

submit this Joint Pretrial Memorandum for the bench trial scheduled for Monday, July 30, 2012

on the issue of the sanction to be imposed against Innova, if any, for its contempt of the Court's

permanent injunction entered against Innova on May 11, 2007.

**(1)    Concise Summary of Evidence to Be Offered Regarding Liability and Damages**

**(1)(a)  Proveris**

**(i)      Unlawful revenues**

Proveris will present evidence of the sales Innova made of its infringing Aerosol Drug

Spray Analyzer ("ADSA") equipment, including the actuators Innova sold to be used with the

ADSA.  Proveris will present evidence to prove that the actuator is a component of the ADSA

and, therefore, that the revenues Innova generated from the sale of the actuators to be used in the

ADSA should be included when the Court determines the sanction it will impose against Innova.

Additionally, Proveris will present evidence of revenue generated from the sale of accessories for use with, and training and installation services for, the ADSA.  Proveris will demonstrate that but for the ADSA sale, Innova would not have sold the accessories and services since the accessories are specifically for use with the ADSA and the services were specifically tied to the ADSA.

Proveris will also present evidence of the revenue Innova generated from providing services to, or with the use of, the ADSA, as well as revenue generated by servicing the infringing Optical Spray Analyzer ("OSA") by "upgrading" it to become an ADSA by installing a software upgrade that also included bug fixes.

With regard to all of the above, Proveris will present evidence of the profits realized by Innova as a result of those sales and services.

**(ii)     The actuator**

Proveris will present evidence to demonstrate that an actuator is a component of the ADSA.

**(iii)     Willful and knowing contempt**

Proveris will present evidence to demonstrate that Innova's contempt was willful and knowing.  Proveris will also present evidence to demonstrate that Innova's willful contempt continued throughout the contempt proceeding and has continued even after the Court entered its order finding Innova to be in contempt.  Proveris will show that the information provided by Innova to counsel to obtain a legal opinion concerning its infringing sales was inaccurate and incomplete, and that counsel relied upon this information without conducting an independent analysis of the equipment, thus vitiating any claimed reliance upon such opinion.

**(iv)     Proveris's losses**

Proveris will present evidence that as a result of the ADSA product and services sales Innova unlawfully made, Proveris lost SprayVIEW® instrument sales, and related accessories and services sales.  Proveris will present evidence of the profits it lost as a result of those lost sales.

### (v)  Proveris's Reasonable Attorneys' Fees

The Court has stated that, if it awards attorneys' fees and costs, it will request a separate submission to present those amounts.  At the Court's discretion, however, as to the presentation of Proveris's attorneys fees incurred in this contempt proceeding, Proveris can be ready to present such evidence.

### (1)(b)  Innova

**Innova objects to any evidence regarding liability on any issue apart from evidence regarding the products and actions taken that were the subject of the contempt proceeding.**

This is a trial on the award of appropriate sanctions, if any, following the Court's ruling that InnovaSystems, Inc. ("Innova") was in contempt of the Court's permanent injunction order entered on May 11, 2007 against Innova's OSA product.  The injunction was entered following a jury trial, where the jury returned a verdict that asserted claims 1 and 2 were not infringed by Innova, that none of the asserted claims were willfully infringed, and that the damage to plaintiff Poveris Scientific Corp. ("Proveris") was zero (0).  Proveris moved post-verdict for an award of damages based on a reasonable royalty.  This motion was denied.  Proveris then moved for reconsideration of the Court's denial of the motion for an award of damages, and this motion was also denied.  The Court entered a directed verdict finding Innova's OSA device infringed claims 3-10 and 13 of the U.S. Patent No. 6,785,400 ( "the '400 Patent"), and entered judgment on the jury's verdict in favor of Innova in all other respects, including not awarding damages.

The contempt Order arises out of Innova's attempt to design a product that would clearly be outside the scope of the injunction and would clearly not infringe claims 3-10 and 13 of the '400 Patent.  The newly designed product is known as the Aerosol Drug Spray Analyzer ("ADSA").  Proveris filed a contempt petition and, following the Court's decision to dispense with a Markman hearing, and on cross motions for summary judgment, the Court issued an Order finding Innova in contempt relating to ADSA.[1]

As to the issue of sanctions, it is common that sanctions are assessed with the goal of making the complaint whole for losses, if any, sustained by the reason of contemptor's acts, . Goya Foods, Inc. v. Wallack Management Co., 344 F.3d 16, 20-21 (1st Cir. 2003).  Innova intends to submit the following evidence making the following arguments.  First, the Court may take judicial notice of the jury award in the underlying infringement case, awarding no damages based on the finding that claims 3-10 and 13 were infringed. [Docket No. 120].  The jury was instructed on the issue of lost profits and the Court barred any consideration as to a reasonable royalty based on the failure of Proveris to put on any such evidence.  After the jury awarded no damages, Proveris filed a Motion For Award of a Reasonable Royalty, Interests, and Costs [Docket No. 128], requesting an award of damages, which the Court denied.  Proveris then filed a Motion for Reconsideration [Docket No. 144], which the Court also denied.  Thus, after the Federal Circuit affirmed the jury award, the finding of no damages for infringement of the '400 Patent became final.

Therefore, *res judicata*, including the doctrines of claim preclusion and issue preclusion, prevent Proveris from now contending that it is not entitled to any compensatory damages arising from any sales of the ADSA or any non-patented component.  Polymer Indus. Products Co. v.

---

[1] Innova argued unsuccessfully that the proceeding involving the ADSA should have gone forward as a separate patent infringement trial with all available defenses.

Bridgestone/Firestone, Inc. 211 F.R.D. 312, 319 (N.D.Ohio, 2002).  To the extent Innova is barred by the doctrine of *res judicata* from relitigating issues relating to patent validity based on the earlier judgment, so too is Proveris barred from relitigating the issue of compensatory damages resulting from any new sales of the ADSA product since this Court has determined that the ADSA product is not colorbly different than the OSA product.[2]

Furthermore, and to the extent *res judicata* is found by this Court to not apply, there is no evidence or law to support and award of compensatory damages for any sales of the ADSA product or any non-patented product or service associated with the ADSA product.

With regard to the possibility of utilizing a punitive aspect to award a sanction, it is noted that the Court stated at an earlier hearing that it was not inclined to find the violation of the injunction was willful.  Innova intends to introduce the following evidence at trial to substantiate the Court's initial reaction that the violation of the permanent injunction was not willful.  First, it will be shown that following the issuance of the permanent injunction order, Innova retained the services of Kenealy Vaidya & Nakajima (the "Kenealy" firm) to review the scope of claims 3 and claims 4-10 and 13 of the '400 Patent.  Based on the analysis by the Kenealy firm as to the scope of claim 3 and, concomitantly, the scope of the permanent injunction, Innova received an opinion by which it prepared a new device that it believed outside the scope of the injunction and not an infringement of the '400 Patent.  That new device is known as the ADSA.  Subsequently, the Kenealy firm memorialized its oral opinion in a written opinion regarding non-infringement letter provided to Innova on or about February 27, 2009.  The oral and written opinions provided by competent patent counsel provided, among other things, "that a properly informed court or

---

[2] Indeed, the Court may have already considered the *res judicata* issue when it mentioned at an earlier hearing relating to the contempt motion that it might only consider awarding legal fees as damages.  Such an award would be in the nature of a punitive award and Innova respectively submits that such an award is not warranted in this instance for numerous reasons describe below.

jury should find that the ADSA products that are made or sold by Innova as described below and in the ADSA User Guide … do not infringe claims 1 through 13 of the '400 Patent, either literally or under the doctrine of equivalents."

Further evidence supporting a finding that a punitive aspect should not properly be the basis of a sanction award in this instance is the fact that all of the '400 Patent claims at issue have now been invalidated by Final Order of the USPTO.  Indeed, the Court indicated in a prior hearing that if the USPTO issued a final action invalidating the claims, the Court would take judicial notice of it in the context of the damages trial.  *See Hearing Tr. dated June 21, 2011*.  Thus, Innova will present evidence of the Final Action issued by the U.S. Patent and Trademark Office ("USPTO"), invalidating claims 3 through 15 of the '400 Patent based on several pieces of prior art.  The evidence will establish that the USPTO Examiner issued a Final Rejection in February 2012 invalidating claims 3 through 15, *sua sponte*, reconsidered its decision by excluding certain prior art, and issued a second Final Rejection dated April 27, 2012, again invalidating claims 3 through 15 based on certain prior art.   Proveris waited until the final day to appeal and filed a notice of appeal.

Thus, based on the totality of the circumstances, the evidence will show that punitive damages are not appropriate in this instance.

**(2)     Statements of Fact**

**(2)(a)  Proveris's Statement of Fact**

**(i)     General**

1.     This Court found Innova to be in contempt of the permanent injunction entered against Innova for its activities in connection with its Aerosol Drug Spray Analyzer equipment ("ADSA"), which infringes Proveris's U.S. Patent No. 6,785,400 (the "'400 patent").

2.      Proveris commenced the contempt action against Innova on March 2, 2010.

3.      By order dated September 21, 2010, the Court found Innova to be in contempt for violating the permanent injunction.

4.      On November 1, 2010, Innova filed a notice of appeal of the non-final order with the United States Court of Appeals for the Federal Circuit.

5.      The Federal Circuit dismissed Innova's appeal on May 27, 2011.

6.      This Court scheduled a bench trial on the issue of the sanction to impose against Innova for its contempt for Tuesday, September 6, 2011.

7.      On Friday, September 2, 2011, Innova filed a petition for bankruptcy.

8.      On December 13, 2011, Proveris filed an unliquidated claim in Innova's bankruptcy case for the amount of the sanction the Court will impose against Innova.

9.      Effective February 28, 2012, to liquidate Proveris's claim in Innova's bankruptcy case, the United States Bankruptcy Court for the District of New Jersey (Camden), lifted the automatic stay to allow the sanctions trial and, thus, the contempt action to be completed.

**(ii)    Innova's post-injunction revenues from product sales in violation of the Permanent Injunction**

10.      Innova sold an ADSA with an actuator to Aeropharm.

11.      Innova sold an ADSA with an actuator to Amneal Pharmaceuticals through a leasing company, Alliance Funding Group.  Amneal paid a small portion of the purchase price directly to Innova.  Alliance Funding Group paid the remaining amount due and leased the ADSA to Amneal.

12.      Innova sold an ADSA with an actuator to Glenmark Pharmaceuticals.

13.     Innova sold an ADSA with an actuator to Gold Card Leasing and shipped the equipment to Impopharma in Canada.

14.     Innova sold an ADSA with an actuator to Mylan/UDL.

15.     Innova sold an ADSA with an actuator to Next Breath LLC.

16.     Innova sold an ADSA with two actuators to NovaDel.

17.     Innova sold to Nycomed an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers

18.     Innova sold to Westech an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.

19.     Innova sold to Cipla Ltd. ("Cipla") an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.

20.     Innova sold to Sun Pharmaceutical Industries Ltd. ("Sun Pharma") an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.

21.     Innova sold an ADSA with an actuator to Alkem Laboratories Ltd. ("Alkem").

**(iii)    Innova's revenues from OSA/ADSA services sales**

22.     Innova sold services to Abbott (f/k/a Kos Pharmaceuticals), which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA.

23.     Innova sold services to PPD, Inc., which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA.

24.     Innova sold services to Exemplar (f/k/a Xemplar), which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA.

25.     In February 2011, Innova sold to Amneal plume geometry height analysis services to assist Amneal with interpreting certain data generated from the ADSA that Amneal leased from Alliance Funding Group.

26.     In September 2010, Innova sold to Amneal a two-year preventive maintenance package for the ADSA.

27.     Innova sold to Mylan/UDL installation and operational qualification services for installing the ADSA.

28.     In 2008, Innova sold Mylan/UDL preventive maintenance services for the ADSA.

29.     In 2009, Innova sold Mylan/UDL preventive maintenance services for the ADSA.

30.     Innova sold Nycomed an extended warranty for the ADSA.

31.     Innova sold to Merck (f/k/a Schering-Plough) in-house services using the ADSA.

**(iv)    Actuators**

32.     The OSA User Guide describes and depicts the OSA as including an actuator.

33.     The OSA Price List lists the type of actuator components that are available for use in the OSA.

34.     The OSA Brochure lists the types of actuator components that are available for use in the OSA.

35.     The ADSA Brief User Guide describes and depicts the ADSA as including an actuator.

36.     The ADSA Price List lists the type of actuator components that are available for use in the ADSA.

37.     The ADSA Website Brochure lists the type of actuator components that are available for use in the ADSA.

38.     The ADSA Schematic drawings depict the ADSA with an actuator.

39.     Innova sold each infringing ADSA with at least one actuator.

**(v)     Willful and knowing contempt**

40.     Innova provided Quote No. 001135, dated January 15, 2007, to Mylan/UDL for the sale of an OSA.

41.     By Purchase Order No. 19193 dated March 22, 2007, four days before the infringement trial began on March 26, 2007, Mylan/UDL placed an order with Innova for the OSA.

42.     On May 11, 2007, the Court entered the permanent injunction against Innova prohibiting Innova from making, using, selling, offering for sale or importing into or exporting out of the United States the OSA.

43.     Since or about entry of the permanent injunction, Innova has not displayed either the OSA or the ADSA, or any other spray pattern plume geometry test equipment, as a product for sale on its website.

44.     On May 17, 2007, John Waters, Innova's president, spoke with an attorney, David Kenealy, asking him to provide an opinion that a "new" product, the ADSA, did not infringe the '400 patent.  Waters provided Kenealy with a copy of the OSA User Guide and the ADSA User Guide and noted for Kenealy the few places in the ADSA User Guide that had been modified as a result of the "new" product.

45.     Kenealy did not inspect the OSA or ADSA; rather, to issue his opinion regarding the differences between the two products he relied only on what Waters told him about the OSA and ADSA, and the minor differences between the product user guides.

46.     Innova provided Quote No. 001164, dated May 21, 2007, to Mylan/UDL for an ADSA.

47.     By handwritten note dated May 22, 2007, the Mylan/UDL purchase order line item describing the OSA was modified such that "Optical" Spray Analyzer was replaced with "Aerosol Drug" Spray Analyzer.

48.     On May 23, 2007, Innova issued Mylan/UDL an invoice for the purchase price of the OSA/ADSA.

49.     In December 2009, Proveris employee Zach Pitluk observed and photographed the ADSA on display at the 2010 Drug Delivery to the Lungs ("DDL") conference in Scotland. He also introduced himself to Waters and Krarup.  The next day, Pitluk observed that the ADSA had been removed from Innova's display.

50.     As of 11 July 2011, Innova was advertising the ADSA on Pharmaceutical-Technology.com, a website available to individuals from the United States and the rest of the world.

51.     At the 2011 Respiratory Drug Delivery ("RDD") conference in May 2011, Pitluk observed the Innova exhibition booth with both Waters and Krarup in attendance.  He also observed that Innova was displaying a poster regarding the ADSA and had ADSA brochures available on a table in its exhibition booth.  When Pitluk approached the table, Waters knocked over the small posters so that they could not be viewed and Krarup picked up the ADSA brochures.

52.     At some point after entry of the contempt order, and at the suggestion of Innova, Innova's distributor in India, Aimil Ltd. ("Aimil"), sent one or two employees to Innova's office

in New Jersey to be trained by Innova on the Innova equipment sold to Sun Pharma, including the ADSA.

53.     Innova shipped the ADSA platform, laser, and camera to India customers Alkem, Cipla, and Sun Pharma from Gunnar Balle, a manufacturer it engaged in Denmark, to avoid the '400 patent.  Innova shipped to Alkem, Cipla, and Sun Pharma from New Jersey the actuator, software, and computer and/or hard drive for each ADSA sold to these customers.

54.     Innova employees traveled from New Jersey to India to complete the installation of the ADSA at each of the India customer sites by combining the ADSA components shipped from Denmark with the ADSA components shipped from New Jersey to provide each customer with a functioning ADSA.

55.     Innova completed each of the installations for the India customer ADSA sales in 2012.

56.     Innova has introduced another "new" spray pattern plume geometry piece of equipment that it is offering for sale in the United States, with the name Single Image Analyzer ("SIA").

57.     The SIA looks the same as the ADSA and someone looking at the two pieces of equipment could not distinguish one from the other one.

58.     Innova introduced the SIA almost immediately after entry of the contempt order.

59.     Proveris lost SprayVIEW instrument sales, and related accessories and services sales, as a result of Innova's unlawful sales.

**(2)(b)  Innova's Response to Proveris's Statement of Facts**

1.     This Court found Innova to be in contempt of the permanent injunction entered against Innova for its prepetition, solely United States activities, in connection with its Aerosol

Drug Spray Analyzer equipment ("ADSA"), which the Court found to infringe Claims 3-10 and 13 of Proveris's U.S. Patent No. 6,785,400 (the "'400 patent").

2.      Proveris commenced the contempt action against Innova on March 2, 2010.

3.      By order dated September 21, 2010, the Court found Innova to be in contempt for violating the permanent injunction based on U.S. sales of the ADSA device.

4.      On November 1, 2010, Innova filed a notice of appeal of the non-final order with the United States Court of Appeals for the Federal Circuit.

5.      The Federal Circuit dismissed Innova's appeal on May 27, 2011.

6.      This Court scheduled a bench trial on the issue of the sanction to impose against Innova for its contempt for Tuesday, September 6, 2011.**[Innova objects to this as irrelevant].**

7.      On September 2, 2011, Innova filed a voluntary petition under chapter 11 of the United States Bankruptcy Code.

8.      On January 10, 2012, the Bankruptcy Court issued an Order granting Proveris limited relief from the automatic stay on February 28, 2012, for the specific narrow purpose "to permit Proveris to liquidate its claim for sanctions in the United States District Court for the District of Massachusetts".

9.      Innova sold an ADSA with an actuator to Aeropharm.

10.     Innova sold an ADSA with an actuator to Amneal Pharmaceuticals through a leasing company, Alliance Funding Group.  Amneal paid a small portion of the purchase price directly to Innova.  Alliance Funding Group paid the remaining amount due and leased the ADSA to Amneal.  **[Innova disputes this fact].**

11.     Innova sold an ADSA with an actuator to Glenmark Pharmaceuticals.  **[Innova disputes this fact]**

12.     Innova sold an ADSA with an actuator to Gold Card Leasing and shipped the equipment to Impopharma in Canada.

13.     Innova sold an ADSA with an actuator to Mylan/UDL.

14.     Innova sold an ADSA with an actuator to Next Breath LLC.

15.     Innova sold an ADSA with two actuators to NovaDel.  **[Innova disputes this fact]**

16.     Innova sold to Nycomed an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.  **[Innova disputes this fact]**

17.     Innova sold to Westech an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.  **[Innova disputes this fact]**

18.     Innova sold to Cipla Ltd. ("Cipla") an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers.  **[Innova disputes this fact.  In addition, Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

19.     Innova sold to Sun Pharmaceutical Industries Ltd. ("Sun Pharma") an ADSA with two actuators, one actuator for testing nasal sprays and the second actuator for testing metered dose inhalers. **[Innova disputes this fact.  In addition, Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.**

**In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

20.     Innova sold an ADSA with an actuator to Alkem Laboratories Ltd. ("Alkem"). **[Innova disputes this fact.  In addition, Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and byond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

21.     Innova sold services to Abbott (f/k/a Kos Pharmaceuticals), which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA**.  [Innova disputes this fact.  In addition, Innova objects as this fact is irrelevant and outside the scope of the trial for damages based on the finding of contempt.  In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

22.     Innova sold services to PPD, Inc., which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA.  **[Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

23.     Innova sold services to Exemplar (f/k/a Xemplar), which entailed the installation of software to the OSA computer to upgrade the OSA equipment to become an ADSA.  **[Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and beyond the**

**narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

24.     In February 2011, Innova sold to Amneal plume geometry height analysis services to assist Amneal with interpreting certain data generated from the ADSA that Amneal leased from Alliance Funding Group.  **[Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

25.     In September 2010, Innova sold to Amneal a two-year preventive maintenance package for the ADSA.  **[Innova disputes this fact.  In addition, Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.  In addition, these facts are irrelevant and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

26.     Innova sold to Mylan/UDL installation and operational qualification services for installing the ADSA.

27.     In 2008, Innova sold Mylan/UDL preventive maintenance services for the ADSA.  **[Innova disputes this fact].**

28.     In 2009, Innova sold Mylan/UDL preventive maintenance services for the ADSA.

29.     Innova sold Nycomed an extended warranty for the ADSA.

30.     Innova sold to Merck (f/k/a Schering-Plough) in-house services using the ADSA.

**[Innova objects to paragraphs 31-38 as these facts are irrelevant and outside the scope of the trial for sanctions based on the finding of contempt].**

31.     The OSA User Guide describes and depicts the OSA as including an actuator.

32.     The OSA Price List lists the type of actuator components that are available for use in the OSA.

33.     The OSA Brochure lists the types of actuator components that are available for use in the OSA.

34.     The ADSA Brief User Guide describes and depicts the ADSA as including an actuator.

35.     The ADSA Price List lists the type of actuator components that are available for use in the ADSA.

36.     The ADSA Website Brochure lists the type of actuator components that are available for use in the ADSA.

37.     The ADSA Schematic drawings depict the ADSA with an actuator.

38.     Innova sold each infringing ADSA with at least one actuator.

39.     Innova provided Quote No. 001135, dated January 15, 2007, to Mylan/UDL for the sale of an OSA.  **[Innova objects as this fact is irrelevant].**

40.     By Purchase Order No. 19193 dated March 22, 2007, four days before the infringement trial began on March 26, 2007, Mylan/UDL placed an order with Innova for the OSA.  **[Innova objects as this fact is irrelevant].**

41.     On May 11, 2007, the Court entered the permanent injunction against Innova prohibiting Innova from making, using, selling, offering for sale or importing into or exporting out of the United States the OSA.  **[Innova objects as this fact is irrelevant].**

42.     Innova has never displayed either the OSA or the ADSA, or any other spray pattern plume geometry test equipment, as a product for sale on its website.

43.     On May 17, 2007, John Waters, Innova's president, spoke with an attorney, David Kenealy, asking him to provide an opinion that a "new" product, the ADSA, did not infringe the '400 patent.  Waters provided Kenealy with a copy of the OSA User Guide and the ADSA User Guide and noted for Kenealy the few places in the ADSA User Guide that had been modified as a result of the "new" product.  **[Innova disputes this statement as it is misleading as stated].**

44.     Kenealy did not inspect the OSA or ADSA; rather, to issue his opinion regarding the differences between the two products he relied only on what Waters told him about the OSA and ADSA, and the minor differences between the product user guides**.  [Innova disputes this statement as it is misleading as stated].**

45.     Innova provided Quote No. 001164, dated May 21, 2007, to Mylan/UDL for an ADSA.

46.     By handwritten note dated May 22, 2007, the Mylan/UDL purchase order line item describing the OSA was modified such that "Optical" Spray Analyzer was replaced with "Aerosol Drug" Spray Analyzer.  **[Innova disputes this statement as it is misleading as stated].**

47.     On May 23, 2007, Innova issued Mylan/UDL an invoice for the purchase price of the OSA/ADSA.  **[Innova disputes this fact.].**

48.     In December 2009, Proveris employee Zach Pitluk observed and photographed the ADSA on display at the 2010 Drug Delivery to the Lungs ("DDL") conference in Scotland. He also introduced himself to Waters and Krarup.  The next day, Pitluk observed that the ADSA had been removed from Innova's display.  **[Innova disputes this statement as it is misleading as stated. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt].**

49.     As of 11 July 2011, Innova was advertising the ADSA on Pharmaceutical-Technology.com, a website available to individuals from the United States and the rest of the world.  **[Innova disputes this fact as it is misleading. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt].**

50.     At the 2011 Respiratory Drug Delivery ("RDD") conference in May 2011, Pitluk observed the Innova exhibition booth with both Waters and Krarup in attendance.  He also observed that Innova was displaying a poster regarding the ADSA and had ADSA brochures available on a table in its exhibition booth.  When Pitluk approached the table, Waters knocked over the small posters so that they could not be viewed and Krarup picked up the ADSA brochures.  **[Innova disputes this statement as it is misleding as stated. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt].**

51.     At some point after entry of the contempt order, and at the suggestion of Innova, Innova's distributor in India, Aimil Ltd. ("Aimil"), sent one or two employees to Innova's office in New Jersey to be trained by Innova on the Innova equipment sold to Sun Pharma, including the ADSA.  **[Innova disputes this fact. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

52.     Innova shipped the ADSA platform, laser, and camera to India customers Alkem, Cipla, and Sun Pharma from Gunnar Balle, a manufacturer it engaged in Denmark, to avoid the '400 patent.  Innova shipped to Alkem, Cipla, and Sun Pharma from New Jersey the actuator, software, and computer and/or hard drive for each ADSA sold to these customers.  **[Innova**

**disputes this fact. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief ].**

53.     Innova employees traveled from New Jersey to India to complete the installation of the ADSA at each of the India customer sites by combining the ADSA components shipped from Denmark with the ADSA components shipped from New Jersey to provide each customer with a functioning ADSA.   **[Innova disputes this statement as it is misleading as stated. Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

54.     Innova completed each of the installations for the India customer ADSA sales in 2012.   **[Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

55.     Innova has introduced another "new" spray pattern plume geometry piece of equipment that it is offering for sale in the United States, with the name Single Image Analyzer ("SIA").   **[Innova objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.]**

56.     The SIA looks the same as the ADSA and someone looking at the two pieces of equipment could not distinguish one from the other one.   **[Innova disputes this fact.  Innova also objects as this fact is irrelevant and outside the scope of the trial for possible sanctions**

**based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

57.     Innova introduced the SIA almost immediately after entry of the contempt order. **[Innova disputes this fact. Innova also objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

58.     Proveris lost SprayVIEW instrument sales, and related accessories and services sales, as a result of Innova's unlawful sales.  **[Innova disputes this fact.  Innova also objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

**(2)(c)   Innova's Statement of Facts**

1.     The Court issued its permanent injunction on May 11, 2007.

2.     The jury awarded no possible sanctions to Proveris based on the finding of infringement on claims 3-13.

3.     Proveris filed a post trial motion asking the Court to award possible sanctions notwithstanding the jury verdict awarding no possible sanctions.

4.     The Court denied the Proveris post trial motion asking the Court to award possible sanctions notwithstanding the jury verdict awarding no possible sanctions.

5.     Proveris filed a motion for reconsideration of the Court's denial of its motion asking that the Court award possible sanctions notwithstanding the jury verdict awarding no possible sanctions.

6.      The Court denied Proveris' motion for reconsideration of the order denying the motion asking that the Court award possible sanctions notwithstanding the jury verdict awarding no possible sanctions.

7.      In Proveris' Memorandum in Support of Motion of Plaintiff Proveris Scientific Corporation for Final Judgment and Permanent Injunction, dated April 24, 2007, Proveris exactingly compared the terms/limitations of independent claim 3 with excerpts from the User Manual for OSA to support its position that the limiting language with regard to the "at a predetermined instant in time" limitation of Claim 3 of the '400 patent was necessary to show how the OSA infringed independent claim 3. See Memorandum in Support of Motion of Plaintiff Proveris Scientific Corporation for Final Judgment and Permanent Injunction at p.10-11.

8.      The Federal Circuit affirmed the jury verdict in all respects, including the award of no possible sanctions to Proveris.

9.      On March 18, 2011, Innova filed an inter parties request for reexamination of the '400 Patent citing 59 reasons why claims 3-13 are invalid based on certain prior art.  The Debtor's Request for Inter-Partes Reexamination included 59 separate bases for rejection of claims 3-13 of the 400 Patent.  Of the submitted proposed rejections, 58 (i.e., 98.3%) were adopted by the USPTO—including all 9 grounds of rejections submitted regarding independent claim 3.

10.      Proveris filed a response to the reexamination request.

11.      On June 29, 2011, the USPTO issued an Order for Re-Examination adopting all nine (9) separate and distinct grounds submitted for rejection of independent claim 3 (the sole independent claim at issue in the 400 Patent) and nearly 60 total separate grounds of rejection for claims 3-13 of the 400 Patent.

12.     On August 29, 2011, Proveris filed its Petition to Terminate Inter-Partes Reexamination Pursuant to 35 U.S.C. § 317, 37 C.F.R. § 1.907(b), and MPEP § 2612 (the "Petition to Terminate") in the Reexamination Proceeding along with a Response to the Order for Reexamination.

13.     On February 1, 2012, the USPTO issued a Final Action finding that claims 3-15 of the '400 Patent are invalid based on prior art.  No claim of the '400 Patent was indicated as including allowable subject matter, and all claims had multiple grounds of rejections facing them.  In effect, the USPTO found all of the claims in the '400 Patent to be invalid.

14.     Proveris did not file a response objecting to the February 1, 2012 Final Action by the USPTO.

15.     On March 1, 2012, Proveris filed a Notice of Appeal of the USPTO's February 1, 2012 Final Action to the Board of Patent Appeals and Interferences.

16.     On February 27, 2012, the USPTO issued, *sua sponte,* a Notice dismissing Proveris' "Petition to Terminate *Inter Partes* Reexamination Pursuant to 35 U.S.C. §317, 37 C.F.R. §1.907(b), and MPEP §2612" (the "Petition to Terminate").   Although Proveris' Petition to Terminate was dismissed, the USPTO  decided "*sua sponte"* to estopp any rejection in the re-examination proceeding of any of claims 3-10 and 13 limited to the application of one or more of the '333 patent, Deljouravesh, and the Settles reference (See page 1 last full paragraph of Decision on Petition).  The estoppel arises out of 35 U.S.C. §317(b) which is a law unique to inter partes re-examination practice that prevent a party from using a reference in an inter-partes re-examination if:  1) the requester was a party to litigation; 2) a final decision exists;  3) the court decided that the requestor did not sustain its burden of proving the invalidity of any claim in suit, which claim is also under reexamination; and 4) the issue raised in the reexamination

proceeding is the same that were raised or could have been raised by the requester in the civil action.  Because  U.S.C. §317(b) is unique to *inter-partes* reexamination, requester is free to file an Ex-Parte reexamination based on the same references, if desired.

17.     In order to comply with the Decision on Petition, the USPTO issued a second Right of Appeal Notice on April 27, 2012.  Despite the estoppel provisions, and without the ability to look at certain prior art references, the USPTO once again set forth final rejections against all claims pending in the re-examination.  No claim upon which reexamination has been requested is indicated as including allowable subject matter.

18.     Thus, even looking at less prior art references, Claim 3 of the '400 patent was still found by the USPTO to be unpatentable for 6 separate reasons based on 6 different prior art references, as set forth in the new Right of Appeal Notice issued on April 27, 2012. Proveris did not file any objection to the second Final Action with the USPTO in any way objecting to the second Final Action.

20.     On May 27, 2012, Proveris filed a second Notice of Appeal of the USPTO's April 27, 2012 Final Action.

21.     On September 2, 2011, Innova filed a voluntary petition under chapter 11 of the United States Bankruptcy Code.

21.     On December 13, 2011, Innova filed Proof of Claim No. 13, asserting a general unsecured claim.

22.     On January 10, 2012, the Bankruptcy Court issued an Order granting Proveris limited relief from the automatic stay on February 28, 2012, for the specific narrow purpose "to permit Proveris to liquidate its claim for sanctions in the United States District Court for the District of Massachusetts".

**(3)      Contested Issues of Fact**

**(3)(a)   Proveris's Contested Issues of Fact**

(i)      Is an actuator a component of the ADSA?

(ii)     Was Innova's contempt willful and knowing?

(iii)    Were Innova's sales to the India customers, which Innova made after entry of the

contempt order, in continued contempt of the permanent injunction?

(iv)     What revenues were did Innova obtain as a result of its contempt?

(v)      What does it cost Innova to make an ADSA?

(vi)     What does it cost Innova to make the actuators used in or sold with the ADSA?

(vii)    What is the profit Innova gained from its unlawful ADSA product and service

sales?

(viii)   What profits did Proveris lose as a result of Innova's contempt?

(ix)     Is the SIA product, which Innova is now offering for sale in the United States,

able to capture a series of images, either by virtue of the camera it uses or by a

software option or modification?


**(3)(b)   Innova's Response to Proveris's Contested Issues of Fact**

**[Innova objects to Proveris' characterization of these as solely issues fact].**

1.      Is an actuator a component of the ADSA?  **[Innova objects as this question is
irrelevant and outside the scope of the trial for possible sanctions based on the finding of
contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court
in its Order Granting Stay Relief].**

2.      Was Innova's contempt willful and knowing?  **[Innova objects to this as it is a mixed question of law and fact].**

3.      Were Innova's sales to the India customers, which Innova made after entry of the contempt order, in continued contempt of the permanent injunction?  **[Innova objects as this question is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief].**

4.      What revenues did Innova obtain as a result of its contempt? **[Innova objects as Innova's revenues are irrelevant to contempt].**

5.      What does it cost Innova to make an ADSA?  **[Innova objects as this question is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt.]**

6.      What does it cost Innova to make the actuators used in or sold with the ADSA? **[Innova objects as this question is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt].**

7.      What is the profit Innova gained from its unlawful ADSA product and service sales?  **[Innova objects as this question is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt].**

8.      What profits did Proveris lose as a result of Innova's contempt?  **[Innova objects as this question is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and Innova also objects based upon Proveris' failure to provide Rule 26 discovery and based on the doctrines of issue and claim preclusion.]**

9.      Is the SIA product, which Innova is now offering for sale in the United States, able to capture a series of images, either by virtue of the camera it uses or by a software option or modification?  **[Innova disputes this fact.  Innova also objects as this fact is irrelevant and outside the scope of the trial for possible sanctions based on the finding of contempt and beyond the narrow scope of the stay relief granted by the Bankruptcy Court in its Order Granting Stay Relief.  In addition, any introduction of evidence related to the SIA product is a due process violation].**

**(3)(c)   Innova's Contested Issues of Fact**

1.      Innova received a verbal opinion, subsequently memorialized in a written opinion, from competent patent counsel in connection with its design of the ADSA that the ADSA did not violate the permanent injunction or infringe any of claims 3-13 of the '400 Patent.

2.      Innova did not attempt to sell and did not sell any ADSA devices prior to receiving the verbal opinion from competent patent counsel.

3.      Innova made a good faith effort to understand the scope of the injunction in connection with its decision to design a device which would not violate the injunction or claims 3-13.

4.      In conjunction with the design of the ADSA, Innova reasonably relied on the argument stressed in Proveris' Memorandum in Support of Motion of Plaintiff Proveris Scientific Corporation for Final Judgment and Permanent Injunction that the preamble language to Claim 3  with regard to the "at a predetermined instant in time" was a critical part of claim 3.

5.      Innova had no way of knowing that Proveris would reverse its position in a contempt proceeding and claim that the preamble language to Claim 3  with regard to the "at a predetermined instant in time" was not a limitation on claim 3.

6.      There were a total of 9 sales of the ADSA in the United States during the period of May 23, 2007 through April 22, 2010.

7.      To the extent the Proveris is not barred by *res judicata* from seeking monetary possible sanctions based on the ADSA sales, Proveris has not proven entitlement to either lost profits or a reasonable royalty for sales of the ADSA.  Furthermore, since the ADSA devise has been adjudicated to not infringe claims 1 and 2 of the 200 Patent, and since Proveris has alleged that its device utilized the invention in those claims, its failure to provide any evidence regarding the market value of the invention of claims 1 – 2 in comparison to the invention of claims 3 – 13 preclude it from any compensation based on lost profits or reasonable royalty.

**(4)      Jurisdictional Question**

Innova raises the issue of whether the Court has jurisdiction in the sanctions trial, without violating Innova's due process rights and right to a jury trial, to consider the issue of whether ADSA sales made overseas constitute an infringement of any claim of the 400 Patent under 35 USC 271(f) where: (1) Proveris has not raised the issue of sales abroad in its petition for contempt; (2) 35 USC 271(f) was not an issue in any prior proceeding and the application of that statute raises a fair ground of doubt as to the wrongfulness of Innova's conduct; and (3) the Bankruptcy Court has not been asked to grant and has not granted relief from the Automatic Stay set forth in 11 U.S.C. § 362 with respect to such foreign sales.

**(5)      Questions Raised by Pending Motions**

There are no pending motions before the Court in this matter.

**(6)      Issues of Law**

**(6)(a)  Proveris Issues of Law**

**(i)      What is the standard for determining the sanction to be imposed against Innova, and should the sanction include a punitive component for willful and knowing contempt?**

The Court "has broad discretion to determine how best to enforce its injunctive decree." Additive Controls & Meas. Sys., Inc. v. Flowdata, Inc. ("AdCon"), 154 F.3d 1345, 1349 (Fed. Cir. 1998).  A sanction for contempt should compensate the patent holder, and may also have a punitive aspect to deter further infringement.  Brine, Inc. v. STX, L.L.C., 367 F. Supp. 2d 61, 70-71 (D. Mass. 2005).  While the compensatory aspect of a sanction should be reasonably related to the patent holder's actual loss, it "need not be perfectly commensurate, dollar for dollar, with" the loss.  Goya Foods, Inc. v. Wallack Management Co., 344 F.3d 16, 20-21 (1st Cir. 2003). Monetary sanctions may include gross profits, interest, reasonable costs, and attorneys fees.  See Goya Foods, 344 F.3d at 20-21 (monetary sanction included pre-judgment interest); Brine, 367 F. Supp. 2d at 70-71 (monetary sanction included gross profits, reasonable costs and attorneys fees).

A sanction may also include an order that the infringing party is prohibited from taking certain actions without first obtaining leave of court.  See AdCon, 154 F.3d at 1356 (sanction included revised injunction to prohibit infringing parties from "undertaking any activities with respect to positive displacement flowmeters without first obtaining leave of court").  A contemnor's intent and willfulness pertain "to the extent of the sanction to be imposed."  Harley Davidson, Inc. v. Morris, 19 F.3d 142, 148-149 (3rd Circ. 1994).  Whatever the sanction, "the need to ensure that the plaintiff is fully compensated and that the defendant is deterred, is acute." Brine, 367 F. Supp. 2d at 71.

The evidentiary question related to this legal issue is whether Innova's contempt, either before and/or after entry of the contempt order, was/is willful and knowing.

**(ii)     If the Court determines that an actuator is not a component of an ADSA, does the sale of one or more actuators for use with the ADSA constitute a "convoyed sale" that should be included in determining the sanction to be imposed against Innova?**

"A 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated non-patented product." American Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1268 (Fed. Cir. 2008). "A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products 'together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit.'" American Seating, 514 F.3d at 1268 (quoting Rite-Hite Corp. v. Kelley Co. Inc., 56 F.3d 1538, 1550 (Fed Cir. 1998).)

The evidentiary question related to this legal issue is whether an actuator is a component of the ADSA.

**(iii)     Do the ADSA sales Innova made after the Court entered the Contempt Order violate the Permanent Injunction when Innova shipped to customers in India the platform and certain components of the ADSA from Denmark, and the actuator, software, and computer for the ADSA from New Jersey, then combined all of the components to produce functioning equipment when Innova employees from New Jersey completed the installation?**

Under 35 U.S.C. §§ 271(f)(1) and 271(f)(2), a  party cannot avoid a United States patent by having certain components of a product manufactured overseas and shipped to an overseas customer, then combining those components with other product components that are

manufactured or assembled and shipped from the United States to form a product that would

infringe the patent had it been entirely manufactured in and shipped from the United States.  35

U.S.C. §§ 271(f)(1) and 271(f)(2) provide as follows:

> (f)(1) Whoever without authority supplies or causes to be supplied in or from the
> United States all or a substantial portion of the components of a patented
> invention, where such components are uncombined in whole or in part, in such
> manner as to actively induce the combination of such components outside of the
> United States in a manner that would infringe the patent if such combination
> occurred within the United States, shall be liable as an infringer.

> (2) Whoever without authority supplies or causes to be supplied in or from the
> United States any component of a patented invention that is especially made or
> especially adapted for use in the invention and not a staple article or commodity
> of commerce suitable for substantial noninfringing use, where such component is
> uncombined in whole or in part, knowing that such component is so made or
> adapted and intending that such component will be combined outside of the
> United States in a manner that would infringe the patent if such combination
> occurred within the United States, shall be liable as an infringer.

35 U.S.C.A. §§ 271 (f)(1) and (f)(2) (West).  Innova does not dispute that it shipped the ADSA

platform, laser, and camera to three customers in India from a manufacturer it engaged in

Denmark to avoid the '400 patent.  Innova also does not dispute that it shipped from New Jersey

the actuator, software, and computer or hard drive for the ADSAs sold to these customers.

Further, Innova does not dispute that employees traveled from New Jersey to India to combine

all of the components and complete the installation of the ADSAs at each of the India customer

sites.  Given these undisputed facts, the issue of law is whether the sales to India violate the

Permanent Injunction.

No evidentiary questions exist to determine this legal issue since Innova documents

demonstrate all of the relevant facts. The only open question is whether, given the facts, Innova's

sales to the India customers are in contempt of the permanent injunction by virtue of 35 U.S.C.

§§ 271(f)(1) and/or 271(f)(2).

**(6)(b)  Innova Issues of Law**

1.      Whether Proveris is barred by the prior jury verdict from obtaining compensatory damages arising from sales of the ADSA.  Innova submits that based on the doctrine of *res judicata,* the prior jury verdict which awarded no monetary damages to Proveris, and which was affirmed in all respects by this Court and the Federal Circuit, bars any monetary compensatory damages based on sales of the infringing device.  Polymer Indus. Products Co. v. Bridgestone/Firestone, Inc. 211 F.R.D. 312, 319 (N.D.Ohio, 2002).

2.      Whether, assuming Proveris is not barred by res judicata from an award of compensatory damages, it is barred from introducing any evidence as to its lost profits for failure to comply with its discovery disclosure obligations under Rule 26 of the Federal Rules of Civil Procedure.

3.      Based on the totality of the circumstances, whether a sanction award is proper given the totality of the circumstances, including the fact that claims 3-15 of the '400 Patent claims have been invalidated by Final Order of the USPTO, as well as the good faith reliance on competent patent counsel that the design of the ADSA did not infringe claims 3-13, an award of punitive damages is not appropriate.

**(7)      Requested Amendments to the Pleadings**

The parties have no requested amendments to the pleadings.

**(8)      Additional Matters to Aid in the Disposition of the Action**

Innova is in the process of preparing and will shortly be filing a motion to vacate and/or modify the permanent injunction based on the Final Rejection by the Patent and Trademark Office of claims 3-15.

**(9)     Probable Trial Length and Jury/Nonjury**

Proveris anticipates that the trial will be 1-2 days, assuming a full trial day beginning at 9:00 a.m.

Innova anticipates that, if all of the irrelevant evidence that is outside the proper scope of the sanctions trial is precluded, the trial should take no more than ½ to 1 day.

**(10)     Witnesses Expected to Testify**

The parties have agreed that objections to proposed witnesses will be exchanged on or before July 19, 2012 and an amended pretrial memorandum will be provided to the Court on July 20, 2012.

**(10)(a) Proveris**

(i)       John J. Waters – Mr. Waters is expected to testify regarding the revenue generated from the ADSA product and service sales Innova made and the costs associated with those sales.  Mr. Waters is also expected to testify regarding supposed modifications made to the OSA and, most recently, to the ADSA, and Innova's attempts to circumvent the '400 patent.  Additionally, he is expected to testify regarding Innova's continued efforts to sell the ADSA after the Court entered the order finding Innova to be in contempt, by having some of the ADSA components manufactured in Denmark.

(ii)       Zachary Pitluk – Dr. Pitluk is expected to present factual testimony regarding Proveris's loss of SprayVIEW® instrument sales as a result of Innova's unlawful sales of the infringing ADSA.  He will also present factual testimony regarding

33

the loss of service and support revenue Proveris would have ordinarily earned as a result of a SprayVIEW instrument sale.  Further, he will present factual testimony regarding his observations of Innova's president, John Waters, and vice president, Henrik Krarup, while they attended an industry conference after the Court entered its order finding Innova in contempt.

(iii)    Ben Okorodudu – Mr. Okorodudu is expected to present factual testimony regarding his knowledge of Innova's efforts in the United States to sell the infringing ADSA after the Court entered the order finding Innova to be in contempt.

(iv)    Dino J. Farina – Mr. Farina is expected to rebut evidence presented by Innova regarding the cost to make an ADSA and the actuators it sells for use in an ADSA.  Mr. Farina is also expected to present factual testimony regarding evidence Proveris presented during the original patent infringement trial regarding Proveris's revenues and costs associated with the sale of its patented SprayVIEW® instrument, and about updated costs and overhead charges included in Proveris's cost to make a SprayVIEW instrument.

(v)    Leo Casey – Mr. Casey is expected to testify and present factual evidence regarding the costs and overhead charges included in Proveris's cost to make a SprayVIEW instrument.

**(10)(b) Innova**

(i)    John Waters, President, InnovaSystems, Inc.

(ii)    David Kenealy, Esquire

(iii)    Henrik Krarup, VP of InnovaSystems, Inc.

**(11)    <u>Proposed Exhibits</u>**

The parties have not yet agreed upon any exhibits; however, they will continue to review all proposed exhibits in an effort to agree to many of them by the time the parties must submit an exhibit binder to the Court.

**(11)(a) Proveris's Proposed Exhibits**

    A.     Innova invoice(s) and quote to Aeropharm

    B.     Innova sales representative, Aimil, sales order form for Alkem sale

    C.     Innova emails related to Alkem shipment

    D.     Innova emails related to Alkem sale and installation

    E.     Innova quote and invoice(s) for sale/lease, and services, to Amneal

    F.     Purchase order to Innova from, and Innova invoices to, Cipla

    G.     Innova invoice to Exemplar (f/k/a Xemplar)

    H.     Innova invoice to Glenmark

    I.     Purchase order to Innova from, and Innova invoice(s) for sale/lease to, Gold Card Leasing (Impopharma)

    J.     Innova invoice(s) to KOS/Abbott

    K.     Innova invoices(s) to Mylan/UDL

    L.     Purchase order to Innova from, and Innova invoice(s) to, Next Breath

    M.     Purchase order and Innova invoice(s) for sale to Vendor Leasing (NovaDel)

    N.     Innova invoice(s) and Innova order document for sale to Nycomed

    O.     Innova invoice to PPD

    P.     Innova proposal and email regarding services for Merck/Schering-Plough

    Q.     Purchase order to Innova from, and Innova invoices to, Sun Pharma

R.     Innova/Gunnar Balle shipping documens and Innova emails related to Sun Pharma, Cipla sales

S.     Innova invoice(s) to Westech

T.     Innova quotations to Mylan/UDL and Mylan/UDL purchase order to Innova

U.     OSA 2005 Price List

V.     OSA User Guide

W.     OSA Website Brochure

X.     ADSA Quote

Y.     ADSA Brief Users Guide

Z.     ADSA Brochure

AA.    U.S. Patent No. 6,785,400

BB.    Permanent Injunction

CC.    Opinion Letter of David J. Kenealy, dated March 25, 2009.

DD.    Email exchange between John Waters and David J. Kenealy dated May 17, 2007; June 22, 2007

EE.    Innova Distributor Agreement with Aimil Limited

FF.    Gunnar Balle invoices to Innova for manufactured parts

GG.    Innova document dated December 6, 2007 regarding the ADSA

HH.    Innova letter from John Waters to Abdul Zahir dated March 11, 2008

II.     Innova quote to Amneal dated August 30, 2011

JJ.    Innova ADSA Schematic drawings

KK.    Innova ADSA Bill of Materials

LL.    Innova 2009 Representative Price List

MM.    Innova cost documents (INNOVA 000162-000167)

NN.    Proveris rent/utilities bill for 2007, 2008, 2009, 2010, 2011, 2012

OO.    Proveris rolled-up Bills of Materials for SprayVIEW® instrument, Vereo® NSx actuator, SprayVIEW® MDx actuator

PP.    Pharmaceutical-Technology.com website pages showing Innova ADSA

QQ.    Photographs from tradeshow

RR.    Any documents needed for rebuttal


**(11)(b) Innova's Proposed Exhibits**

BA.    Jury verdict in infringement trial

BB.    Proveris's Motion For Award of a Reasonable Royalty, Interests, and Costs

BC.    Court order denying Proveris's Motion For Award of a Reasonable Royalty, Interests, and Costs

BD.    Proveris's Motion for Reconsideration of Court Order denying Proveris's Motion For Award of a Reasonable Royalty, Interests, and Costs

BE.    Court order denying Proveris's Motion For Reconsideration of Court order denying Proveris's Motion For Award of a Reasonable Royalty, Interests, and Costs

BF.    Federal Circuit Opinion affirming jury verdict

BG.    Entire USPTO Inter-parties Reexamination File

BH.    Voluntary chapter 11 petition of InnovaSystems, Inc.

BI.   Bankruptcy Court order granting limited stay relief to Proveris

BJ.   Spreadsheets showing profit on each ADSA sale in the United States

BK.   Back up documentation of costs associated with ADSA sales in the United

States

BL.   Proof of Claim number 13 filed by Proveris in the Bankruptcy Court.

**(12)   Status of Settlement Discussions**

The parties are in the process of discussing settlement and have met this morning and

may continue discussions this afternoon, although at this point no settlement has been reached.

**(13)   General Reservation of Rights**

Each party reserves its rights to make any objections not herein made and to provide

supplemental briefing on any issues raised by herein.



**Respectfully submitted,**


**PROVERIS SCIENTIFIC CORPORATION**
Plaintiff
By its attorneys,


/s/ Victor H. Polk, Jr.
Victor H. Polk, Jr., BBO #546099
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA  02110
Tel.:  (617) 310-6000
Fax:  (617) 310-6001
Email:  polkv@gtlaw.com


Susan H. Farina, BBO #568068
PROVERIS SCIENTIFIC CORPORATION

290 Donald Lynch Boulevard, Suite 100
Marlborough, MA  01752
Tel.:  (508) 460-8822
Fax:  (508) 460-8942
Email:  sfarina@proveris.com


**INNOVASYSTEMS, INC.**
Defendant
By its attorneys,


/s/ Michael J. Fencer
Michael J. Fencer, BBO#648288
Jonathan M. Horne, BBO#673098
JAGER SMITH P.C.
One Financial Center
Boston, MA  02111
Tel.:  (617) 951-0500
Fax:  (617) 951-2414
Email:  mfencer@jagersmith.com


Admitted *pro hac vice*
Samuel H. Israel
Joseph Posillico
Martha B. Chovanes
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA  19103-3222
Tel.:  (215) 299-2886
Fax:  (215) 299-2150
Email:  sisrael@foxrothschild.com


Dated:  July 13, 2012